## In the Matter of the Estate of George C. Benton, Deceased.

## Chicago Title and Trust Company, Administrator of the Estate of Harriet Benton Ward, Deceased, Claimant and Appellant, v. Charles W. Ward, Executor of the Estate of George C. Benton, Deceased, Defendant and Appellee.

### Gen. No. 29,485.

1. CORPORATIONS—*effect of retention of certificate by transferor after registered transfer on corporate books.* Apart from the Uniform Stock Transfer Act, passed in 1917, Cahill's St. ch. 32, ¶ 229 *et seq.*, it is the law in this State that a regular transfer of stock on the books of the company not only passes the legal title to the transferee, but gives rise to a presumption that the transferee is the owner without a delivery of the certificate, and even if the transferor retains in his possession the certificate, that retention is not in and of itself sufficient evidence to avoid the transfer of ownership.

2. ESTATES OF DECEDENTS—*sufficiency of evidence of claim against estate of decedent for conversion.* Where, on the hearing of a claim against a father's estate for the conversion of shares of stock, it appeared that he had made a completed gift of such stock to his daughter, and it further appeared that the daughter had the certificate in her possession and actually wrote her name on the back at the bottom of a blank assignment, and that such certificate was returned and surrendered and a new certificate issued in accord with the assignment, the proper and reasonable inference was that the assignee lawfully obtained possession of the certificate and was legally entitled to have the change made on the books of the company and a new certificate issued to him, and consequently, under the evidence, no conversion by the father was shown, although the evidence as to what occurred after the daughter's death might have given rise to a suspicion, insufficient in itself to make out the claim against the father's estate, that the daughter never in her lifetime parted with her ownership of the stock.

3. ESTATES OF DECEDENTS—*burden of proving claim of conversion against estate of decedent.* Where an administrator filed a claim against the estate of his intestate's father for the conversion of shares of stock, the burden was on him to show that at the time of his intestate's death she was the owner of the shares, and, the certificates having been indorsed in blank, he had the burden to prove that his intestate had not by overt acts given over her interest in the stock to a third person.

4. GIFTS—*sufficiency of proof of gift inter vivos of corporate stock from father to child.* Where a father, who was president of a corporation, caused shares of the stock of such corporation to be issued to his daughter and paid the consideration, and the books of the company at all times, until the daughter's death, showed her to be the owner, a fully consummated gift *inter vivos* was established under the evidence and existed at the time of her death, notwithstanding the fact that the father retained the physical certificates, unindorsed and unassigned by the daughter; and the father could not, by his own acts alone and of his own volition and after the daughter's death, legally deprive the daughter's estate of her established property rights.

5. TRUSTS—*when transfer of personalty is gift and not a resulting trust.* The law of resulting trusts is not applied with the same rigor, in regard to alleged gifts of personal or quasi-personal property as it is regarding gifts or grants of realty, and hence, where the evidence on the hearing of a claim against a father's estate for conversion of shares of stock showed that there was a completely executed gift *inter vivos* of such corporate stock by the father to the daughter, the mere fact that the donor furnished the consideration for the original purchase of the stock does not make the transaction a resulting trust.

THOMSON, J., dissenting.

Appeal by plaintiff from the judgment of the Circuit Court of Cook county; the Hon. JOHN A. SWANSON, Judge, presiding. Heard in the third division of this court for the first district at the October term, 1924. Reversed in part and judgment here. Opinion filed June 17, 1925.

FISHER, BOYDEN, KALES & BELL, for appellant; DARRELL S. BOYD and ROY P. KELLY, of counsel.

MONTGOMERY, HART & SMITH, for appellee; LOUIS E. HART and IRVING HERRIOTT, of counsel.

MR. JUSTICE TAYLOR delivered the opinion of the court.

In the estate of George C. Benton, pending in the probate court of Cook county, a claim was filed by the Chicago Title and Trust Company, as administrator of the estate of Harriot B. Ward, deceased. The claim consisted of two items. One was for the conversion of 350 shares of the capital stock of the Delta

and Pine Land Company (hereinafter called the Delta Company) of the alleged value of $70,000, and the other, for $3,500, the alleged value of 25 shares of the capital stock of the Chicago Title and Trust Company.

On July 21, 1905, both claims were disallowed by the probate court. There was an appeal to the circuit court, a trial *de novo* and a verdict and judgment for the claimant for $3,400 on the claim for the stock of the Chicago Title and Trust Company, and a verdict and judgment against the claim for the stock in the Delta Company. There was an appeal to this court, and a judgment reversing the judgment of the circuit court and remanding the cause for a new trial. That reversal was on the ground of error in excluding admissible evidence. *In re Benton's Estate*, 215 Ill. App. 631. There was another trial before the court, without a jury, and on April 28, 1924, a judgment wholly in favor of the estate of George C. Benton, deceased, and against the claimant. This appeal, by the administrator of the estate of Harriot Benton Ward, is from that judgment.

It is the theory of the claimant, the Chicago Title and Trust Company, as administrator of the estate of Harriot Benton Ward, deceased, that George C. Benton, in his lifetime, put the complete ownership of 25 shares of the Chicago Title and Trust Company stock and of 350 shares of the Delta Company stock in his daughter, Harriot Benton Ward (nee Benton), and that upon her death the said stock was part of her estate. On the other hand, it is the theory of Charles W. Ward, executor of the estate of George C. Benton, deceased, that the ownership of the property in question was never completed in Harriot Benton Ward, and that upon her death her estate was not the owner of the property in question.

Harriot Benton Ward, of whose estate the claimant is administrator, was the daughter of George C. Benton, against whose estate the claim is filed. She was the wife of Dr. Charles W. Ward, to whom she was

married in June, 1894. He is one of the executors of the will of George C. Benton.

George C. Benton was married twice and Mrs. Ward was the daughter of the first wife. His second wife was Susan D. Benton. Harriot Benton Ward (known before her marriage as Harriot T. Benton) died April 16, 1896, so her husband testified—leaving her husband and an infant daughter, Harriot S. Ward, her only heirs at law and next of kin. George C. Benton died—according to Ward's testimony—on July 26, 1902. His second wife and the infant granddaughter survive him. The infant granddaughter was about one year and a half old at the time of her mother's death. She is now a woman in the early twenties, unmarried, and living with her father in Chicago. George C. Benton in his lifetime was in business, and considered a man of good standing in the community; and was a man of considerable means, being worth over $100,000. He was president and chief stockholder in the Delta Company, a Mississippi corporation, which dealt in lands and notes.

On or about January 19, 1892, George C. Benton purchased 25 shares of the capital stock of the Chicago Title and Trust Company. It is not disclosed how much he paid for that stock, but his holdings were carried in his trial balances, while he held it, at $2,500. On the date of the purchase, January 19, 1922, a certificate bearing the number 1321, for 25 shares of the capital stock of the Chicago Title and Trust Company, was issued in the name of G. C. Benton. On August 7, 1893, according to the books of the Chicago Title and Trust Company, that certificate for 25 shares was surrendered, and in lieu thereof a certificate bearing the number 2172 for 25 shares was issued in the name of Harriot T. Benton. That was about two years and eight months before she died. The stub of the stock book contained a receipt for the 25 shares, certificate No. 2172, as follows: "Harriot T. Benton, by G. C. Benton," the signatures being in the handwriting of

George C. Benton. That indicated that a certificate for 25 shares was issued at the direction of Benton in the name of, to and for her. On November 21, 1898, about two years and eight months after her death, and about five years and three months after the certificate had been issued to her, that certificate, No. 2172, was returned to the Chicago Title and Trust Company and in its stead another certificate, No. 2785, was issued in the name of E. A. Shedd. On the back of certificate No. 2172, as surrendered, below a printed assignment, with blanks unfilled, was the authentic signature of Harriot T. Benton. The assignment bore no date.

Dividend checks of the Chicago Title and Trust Company upon the 25 shares standing in the name of Harriot T. Benton, covering the period from January 1, 1896 to October, 1898 (she died on April 18, 1896) were sent out in the name of Harriot T. Benton. The dividend check dated January 1, 1896, was addressed to her in her own name and was indorsed in her name in her own handwriting. The dividend check dated April 1, 1896, payable to Harriot T. Benton, was not indorsed by her, but was indorsed, "Harriot T. Benton, per C. W. Ward." Subsequent dividend checks, all made out after her death, ten in number, were issued payable to Harriot T. Benton, the last being dated October 1, 1898; each was indorsed with the name of Harriot T. Benton, in script, and below that name was written, G. C. Benton. It was agreed that the indorsement G. C. Benton was in his own handwriting, and that the name of the payee, Harriot T. Benton, who was dead, either in G. C. Benton's handwriting, or procured by him to be placed thereon. The photostatic copies of the ten dividend checks, beginning with the one dated July 1, 1896, and ending with the one dated October 1, 1898, all of which were payable to Harriot T. Benton as payee—although at the time she was dead—seem to show that whoever wrote the words Harriot T. Benton on the backs of those checks, by way of indorsement, in order to pass title,

undertook to write them, apparently, in a feminine hand; whether to conceal her death, or for some other purpose, there is no evidence. No dividend checks dated prior to January 1, 1896 were offered, and whether the Chicago Title and Trust Company paid dividends prior to that time is not shown. In regard to the ownership by Harriot T. Benton in her lifetime of the 25 shares of the capital stock of the Chicago Title and Trust Company, that is all the material evidence.

On November 12, 1895, George C. Benton, who was the owner of 2,578 shares of the capital stock of the Delta Company, being the largest stockholder, the total capitalization of the company being 6,000 shares, bought, in the name of his daughter, 350 shares of stock in that company at about $30 a share, for a total consideration of $11,000. Apparently, he paid for that stock by giving a $1,000 bond of the Delta Company, a note for $1,000 due in four months, and a note for $9,000, due in three years and payable to one Watson. He purchased the 350 additional shares of stock of the Delta Company, and caused the certificates representing that purchase to be issued in the name of his daughter, Harriot J. Benton Ward. Representing that purchase, there were introduced in evidence four certificates of the capital stock of the Delta Company, three being numbered 83, 84 and 85, each for 100 shares, and one numbered 86 being for 50 shares, all dated November 12, 1895, and issued in the name of Harriot J. Benton Ward. The stub in the stock book of the Delta Company recites that certificate 83 for 100 shares was issued to Harriot J. Benton Ward, whose residence was Chicago; that the date of the certificate was November 12, 1895; that that certificate was issued in place of certificate No. 7 for 100 shares, which was canceled on November 12, 1895. That stub also recited further, showing what transpired after her death: "This certificate received and cancelled Febry. 28, 1898 & Certificate No. 89 for 100 shares

issued to G. C. Benton." The stub of each of the three other certificates in the stock book of the Delta Company contains similar data concerning those respective certificates. Each of the four certificates issued to Harriot J. Benton Ward contains on the back an assignment to G. C. Benton, signed "Harriot J. Benton Ward," and dated January 10, 1896. The signature "Harriot J. Benton Ward" was either written by George C. Benton, or by someone under his direction. There is no evidence in the record as to the physical possession of the four certificates until their subsequent surrender by George C. Benton.

One Dr. Merriman, who was one of the executors of the will of George C. Benton, testified—by deposition—that he had a conversation with Charles W. Ward, husband of Harriot J. Ward, shortly after July 26, 1902, the date of the death of George C. Benton; that Ward told him he was going to present a claim for the stock which was given to his, Ward's, wife, and which Mr. Benton had afterwards transferred to himself; that he, the witness, objected, and stated he did not think it was fair when Mr. Benton had given to him, Ward, so soon after, 350 shares, and after that had given him 650 shares more; that that showed that Mr. Benton "did not intend to have him have that first 350 shares," and Ward said, "That is all right, doctor; that may be so as far as my daughter is concerned, but where do I come in? I am entitled to an interest in my wife's estate"; that he, the witness, said that Benton had been very generous to him, and that he did not think Ward ought to do it, and that Ward said, "Well, he ought to have left that for me"; that Ward further said that he had consulted a friend, a cashier of a bank in Carrollton, who had advised him to wait until after Benton's death before bringing suit for the 350 shares. Dr. Merriman further testified (objection to the evidence being withdrawn) that Mrs. Ward "spoke of her father having put in her name 350 shares of that stock at one time when I called

there.   We were discussing the Delta and Pine land stock, and I mentioned that her father had done it.   I supposed she knew, and she said, 'Yes, he has told me' ''; that that conversation occurred in Ward's home, and that he had a very distinct recollection of it; that she was speaking of the Delta Company, and she further said that she wished her father could sell the whole property.

No dividends were paid on the 350 shares of the Delta Company stock while it stood in the name of Harriot J. Benton Ward.   On February 28, 1898, a little less than two years after the death of Harriot Benton Ward, as stated above, the certificates representing the 350 shares were turned in to the Delta Company, bearing what purported to be the indorsement of Harriot J. Benton Ward, directing the secretary of the company to transfer the stock and issue new certificates in the name of George C. Benton.   The indorsements on those certificates of the name of Harriot J. Benton Ward was admittedly in the handwriting of George C. Benton, or written at his instigation. An examination of the photostatic copies of the assignments on the back of the certificates suggests that in writing the signature of Harriot J. Benton Ward, George C. Benton, if he wrote it, and it is a fair inference that he did, undertook to disguise his normal handwriting and make the signature appear to be written by someone else.

The trial balances of George C. Benton, after the purchase of the 350 shares of the Delta Company shares in the name of Harriot J. Benton Ward, do not include within them any amounts representing that stock.

Copies of certain entries in books of account that were kept by George C. Benton, were offered in evidence.

The trial balances that appear in his personal ledger, although they purport to show the amount he carried as invested in Delta Company stock, do not show—

although he paid $11,000 for the 350 shares in question —that he made any change in the amount mentioned in the trial balance made immediately after the purchase; in other words, in no succeeding trial balance after he made the purchase was the $11,000 included as an addition to his investment in Delta Company stock. The trial balance of January 3, 1895, and the trial balance of January 3, 1896, a few months before the death of his daughter, remain the same, that is, $56,783.03. After her death changes were made, but they are not necessarily significant.

Evidence was introduced concerning certain stock transactions that took place after his daughter's death. The record shows that on May 12, 1898, George C. Benton caused to be issued in the name of Ward, husband of Benton's deceased daughter, a certificate, No. 91, for 350 shares of the capital stock of the Delta Company, and on June 20, 1902, certificate No. 108, for 650 shares. Ward testified that the certificate for 350 shares he indorsed in blank, and handed it back to George C. Benton, and did not see it again until 1902 when Benton handed it back to him again, together with the certificate for 650 shares.

Subsequently, in 1902, a bill of interpleader was filed by the Delta Company against Ward and others, and one of the issues in that case pertained to the just-mentioned 350 and 650 shares of the Delta Company. The matter was tried in the superior court, and a decree was entered that Ward held the 1,000 shares above mentioned as trustee of his daughter Harriot. The facts concerning that litigation are recited in the opinion of Mr. Justice Baume in the *Delta & Pine Land Co. v. Benton,* 171 Ill. App. 635. The decision in that case affirmed the judgment of the superior court. The court there said: "The gift to Ward, in trust for Harriot, was absolute, unconditional and operative *in præsenti.*" That is *res adjudicata* as to the transfer of the 1,000 shares, and

there is no evidence that the 350 shares here in question have any relation to any part of that 1,000 shares.

As regards the ownership of the 25 shares of the Chicago Title and Trust Company stock, the question arises whether, on August 7, 1893, when that company issued a certificate in the name of Harriot T. Benton —which recited that Harriot T. Benton was the owner of 25 shares of the capital stock transferable only on the books of the company in person or by attorney, upon the surrender of that certificate—the title passed to Harriot T. Benton as the donee of her father, who paid the consideration therefor and remained in her at the time of her death. A similar question arises, also, in regard to the 350 shares of the Delta Company stock which were issued on November 12, 1895.

The authorities upon that subject throughout the country are somewhat in confusion. It is argued on the one hand that the normal and reasonable way of accomplishing a change in ownership of such property is by a transfer on the books of the company; that where that takes place, there is sufficient evidence of the intention and act of the donor, and further, that the stock book of a corporation is necessarily the official and ultimate record which shows who owns the stock and who are the stockholders. It is urged by some, however, that the physical certificates of stock ought to be considered as in the nature of chattels or tangible commodities; and be transferable like ordinary commodities; that, in fact, as a matter of commercial usage, they have been so treated.

In England, however, and in many of the States, it has been held that a transfer on the books of the company, together with some proof or presumption of intention, may create and constitute a valid gift. The case of *Colton v. Williams*, 65 Ill. App. 466, although not directly in point as to all the facts, is quite illuminating as to certain principles pertaining to the ownership of interests in a corporation for profit in this State. The facts in that case were somewhat

unusual. One Gordon inherited some bank stock from his wife. It was in her name on the books of the bank when she died. It was not transferred to him on the books of the company, although he was treated as the owner of the stock. He remarried and orally gave it to his second wife, informing the company of the change which had been made. The second wife had the same Christian name as the first wife, so no new certificate was issued, and the stock remained on the books in the original name. Gordon retained possession of the certificate all the time. The court there held that the gift was valid. An analysis of that case shows that the court considered a transfer on the books of the corporation, or its equivalent, sufficient to constitute a consummated gift. The late Mr. Justice Cartwright, then sitting in the Appellate Court, said: "The title to stock is created by registry in the books of the corporation. The certificate is not the stock itself, but only evidence of the ownership of the stock. It has value only as such evidence, and apart from the shares which it represents it is utterly worthless. It is not essential, and a registered stockholder may exercise all his privileges without it. He has power to transfer his stock, to receive dividends and to vote, and he is individually liable as a stockholder, although without the usual voucher in the form of a certificate." Citing Cook on Stock and Stockholders, sec. 10; Beach on Private Corporations, sec. 972. This language of Mr. Cartwright was quoted with approval in *Thomas v. Thomas*, 70 Colo. 29.

The case of *Roberts' Appeal*, 85 Pa. St. 84, holds that a transfer on the corporation's books is the essential thing and is sufficient. The facts in that case are these: the testator, being the owner of certain stock, caused it to be transferred on the books of the company into the name of his orphan niece, no delivery of the certificate being made and no notice of the transfer being given to her. Upon the testator's death the certificate was found among his papers. The niece

brought suit in equity against the administrator of the testator's estate, asking for a delivery of the property and an accounting for the dividends. In giving the relief prayed for, the court said:

"But here the gift is complete by the delivery of the thing itself, for transferring the shares to her upon the books of the company is putting her in complete possession of the thing assigned, and clothing her with the complete legal title. It stands in the place of a delivery. Such an act performs precisely the office which an actual delivery would perform if it were a chattel. It is as complete a delivery as the nature of the thing will admit of.  *  *  *  Retaining in his possession the certificates which are in her name, and which he could not use without her consent, cannot undo or qualify the decisive ownership with which he had invested her by the actual transfer to her on the books of the company. The best evidence of her ownership is the transfer on the books of the company."

The law as set forth in the *Colton* case and *Roberts' Appeal* seems to be sanctioned or followed in these cases: *Deming v. Williams,* 26 Conn. 226; *Goodwin v. Hampton Transp. Co.,* 133 Mich. 229; *Thomas v. Thomas,* 70 Colo. 29; *Francis v. New York & B. E. R. Co.,* 17 Abb. N. C. (N. Y.) 1; *In re Babcock's Estate,* 85 Misc. 256, 147 N. Y. Supp. 168; *Miller v. Williams,* 195 Iowa 1305, 192 N. W. 798; *Mize v. Bates County Nat. Bank,* 60 Mo. App. 358. See Mechem, 20 Ill. Law Review, p. 8. The principle in the *Colton* case that a delivery of the certificate of stock is not essential to the transfer of shares was reiterated in *Allen v. Williams,* 212 Ill. App. 114, and *Allmon v. Salem Building & Loan Ass'n,* 194 Ill. App. 224.

In the *Allen* case, *supra,* this court said: "The delivery of a certificate of stock is not necessary to transfer the title thereto." And in the *Allmon* case, *supra,* the same doctrine was reiterated. Apparently, the only law in this State on the subject—and it is consistent with that in many other jurisdictions—is all one way, beginning with Mr. Justice Cartwright's

statement in the *Colton* case, made over thirty years ago. So, notwithstanding, there are in certain other jurisdictions many cases to the contrary—of which *Besson v. Stevens,* 94 N. J. Eq. 549, is an example—it is our judgment that we are only justified in being consistent in applying the law as it has been announced, and as we find it in this State.

Notwithstanding there are, as we have said, in other jurisdictions cases to the contrary, it is our judgment that it is the law in this State—apart from the Uniform Stock Transfer Act, passed in 1917 [Cahill's St. ch. 32, ¶ 229 *et seq.*]—that a regular transfer of stock on the books of the company not only passes the legal title to the transferee, but gives rise to a presumption that the transferee is the owner without a delivery of the certificate, and even if the transferor retains in his possession the certificate, that retention is not in and of itself sufficient evidence to avoid the transfer of ownership. It may be said that the *Colton, Allen* and *Allmon* cases are not in their facts exactly the same as the instant case. That is admitted. But, father and daughter here are presumed to have acted with a knowledge of the law as it was when the facts came into being; and as the only expressions of the law on the subject in this State, at that time, were those which were very plainly stated in the *Colton* case, it follows, we think, *ex necessitate legis,* by these their rights should be adjudged.

In regard to the 25 shares of the capital stock of the Chicago Title and Trust Company, as the evidence showed: (1) that Harriot T. Benton was his daughter; (2) that on August 7, 1893, in her lifetime, he surrendered to that company a certificate of stock for 25 shares, and caused to be issued in lieu thereof a certificate for the same number of shares in the name of his daughter; (3) that the stub of the stock book of the Chicago Title and Trust Company contained a receipt for the 25 shares issued to her, signed, "Harriot T. Benton by G. C. Benton," written by him;

Chicago Title & Trust Co. v. Ward, 237 Ill. App. 500.

(4) that two dividend checks of the Chicago Title and Trust Company upon the 25 shares standing in her name were sent out to her in her name as payee, and one indorsed in her own name and in her handwriting' and cashed and one to her in her own name and indorsed Harriot T. Benton per C. W. Ward, who was her husband; (5) that subsequent to her death, ten dividend checks upon the 25 shares still standing in her name were issued payable to her, in her name, the last being dated October, 1898 (nearly two years and six months after her death); (6) that the photostatic copies of the ten posthumous dividend checks were all indorsed by him or at his direction and his daughter's name seemingly simulated, all without legal right; (7) that on the face of the certificate issued to her, it was provided that it was transferable only on the books of the company; it follows, applying the principle announced in the *Colton* case, that, at the time of her death, she was the owner of an interest in the Chicago Title and Trust Company to the extent of 25 shares of its capital stock, provided, however, there is sufficient evidence to show that before her death she did not part with her ownership.

It will be seen that although under our law, as we find it, there is ample evidence that the father made a completed gift to his daughter, there is one significant circumstance which necessarily must be given considerable weight, and that is the fact that the daughter, in her lifetime, not only had the certificate itself in her possession, but actually wrote her own name on the back of it at the bottom of a blank and undated assignment; when, therefore, that certificate was returned and surrendered to the Chicago Title and Trust Company and a new certificate issued in accordance with the daughter's own assignment on the back, the proper and reasonable inference from those facts is, that Shedd lawfully obtained possession of the certificate, and, as a consequence, was legally entitled to have the change made on the books of the com-

pany and a new certificate issued to him. When that was done, not only did he possess the certificate of stock running to him, but the records of the corporation showed him to be the owner.

It must be remembered that the burden of proof was upon the representative of the daughter's estate to show that at the time of the daughter's death she was the owner of the 25 shares of stock; and, further, as the result of that responsibility and the fact that she indorsed the certificate, it was necessary for the representative of her estate to prove that she had not, by overt acts, given over her interest in the stock in question to a third person. This court held in *Harris v. Harris*, 222 Ill. App. 164, that one might, by appropriate writing, legally transfer his interest in shares of stock. The result is, in the instant matter, in our judgment, that the representative of the daughter's estate failed to show that at the time of her death she had not parted with her interest therein.

The record is silent as to the way in which or the time when the certificate got into the possession of Shedd, with an assignment on it which permitted him to go to the Chicago Title and Trust Company and have a transfer made on the books to his own name. Although we assume that it was the law in this State at the time these matters arose, as stated in the *Colton* case, that what the registry shows is—at least at the outset—without anything further, the essential thing, nevertheless here we are compelled to hold, in view of what the record shows as to her signature on the assignment of the certificate and the subsequent transfer on the records of the company, that the representative of her estate, although he proved a gift had at one time been completed, failed to prove that she had not parted with her rights; and, in consequence, failed to prove that he as the representative of her estate was entitled to a charge against her father's estate for the value of the 25 shares of Chicago Title and Trust Company stock.

As between the daughter's estate and that of her father, the evidence shows a completed gift, but as between the daughter's estate and Shedd, it fails to show that Shedd did not obtain ownership rightfully and in her lifetime; and, if he did, then there was no conversion by her father.

The evidence as to what transpired after her death may give rise to a suspicion that the daughter never in her lifetime in any way parted with her ownership of stock in the company, but that is not sufficient to make out the claim made against her father's estate.

In regard to the ownership of the 350 shares of Delta Company stock, the evidence showed (1) that on November 12, 1895, George C. Benton, who was president of that company, and owned 2,578 shares of the total capital stock of 6,000 shares, caused to be issued in the name of his daughter, 350 shares of the company's stock, and paid therefor $11,000; (2) that, representing that purchase, four certificates of that company, all dated November 12, 1895, were issued in the name of Harriot J. Benton Ward; (3) that the stubs in the stock book of that company recited that those certificates for 350 shares were issued to Harriot J. Benton Ward on November 12, 1895; (4) that the stubs also recited that on February 28, 1898—nearly two years after his daughter's death—those certificates were received by the Delta Company and canceled, and new certificates in similar amounts issued to G. C. Benton; (5) that each of the four certificates issued to Harriot J. Benton Ward contains on the back what purports to be an assignment to G. C. Benton, dated January 10, 1896—nearly two years after his daughter's death—signed, "Harriot J. Benton Ward," which signature was either written by George C. Benton, or by someone under his direction; (6) that Harriot J. Benton Ward told Dr. Merriman she knew that her father had put 350 shares of the Delta Company stock in her name; that her father had told her so; (7) that in writing the name of Harriot J. Benton Ward on the

backs of the certificates purporting to constitute assignments, George C. Benton, or the one he authorized to do it, undertook to make the signature appear to be written by someone else; (8) that the trial balances in the personal records of account of George C. Benton did not show that he had purchased the 350 shares for himself.

The law, as we have announced it above, applied to those facts, determines that the daughter owned the 350 shares at the time of her death. Her father caused those shares to be issued to her and he paid the consideration; the books of the company all the time thereafter until her death designated her as and showed her to be the owner. The fact that nearly two years after her death he indorsed her name on the certificates and turned them in certainly is not sufficient evidence to override the evidence of her ownership. That her father retained the physical certificates of stock, especially as they were unindorsed and unassigned by her, does not undermine in any way the claim of her estate, that it was a fully consummated gift *inter vivos* and remained such at the time of her death. Nor does the fact that he was president of the company and owner of a large part of its capital stock in any way alter the case. Having caused the shares to be issued to her, he could not, by his own acts alone, and of his own volition, and after her death, legally deprive her estate of her established property rights; as to him, the gift was irrevocable; there remained no *locus penitentiæ*. He may have thought he still owned the shares, but he must be here judged by his overt acts. Then, too, considering what his own personal ledger shows, it is a fair inference that even he fully understood and actually intended that the shares should be the property of his daughter.

In our view of the case, the question of a resulting trust is not involved. As to gifts and grants of real estate, the law of resulting trusts has become well established—apparently, historically, on the ground

that there is some superior sacredness about that form of property—but we do not find that it is applied with the same rigor in regard to personal or quasi-personal property. *Creed v. Lancaster Bank,* 1 Ohio St. 1. Where, as here, applying the law of this State as we have set it forth, the evidence shows that there was a gift of personal property, it matters not whether the donee was a daughter or a stranger; where the donee proves the necessary overt acts constituting a gift of personal property, then it is not a sufficient answer for the donor merely to say he paid the consideration, even though the converse might be true if the subject matter were real estate.  Further, it is not rational for the representative of the father's estate to claim that the daughter never owned the stock, that there never was a completed gift, and at the same time claim that she did own it, but that there was a resulting trust in favor of the father.  Assuming, as we are bound to do, that her father bought the 350 shares of stock of the company in which he was the dominant owner, and had the certificates issued in his daughter's name and had the stock book of the company show that she was the owner, it would be stultification and not equity to hold that what he did should be undone as being done against his will, and then, in addition, hold that the prima facie presumption is that there was a resulting trust.  Bearing in mind the language of Mr. Justice Cartwright in the *Colton* case, *supra,* "The title of the stock is created by registry in the books of the corporation," and applying the principle therein involved to the evidence in the case, we feel bound to hold, no matter upon whom was the burden of proof, that a valid completed gift was made, and that upon her death it belonged to her estate, and that there was no resulting trust involved.

We are of the opinion that the Chicago Title & Trust Company, as administrator of the estate of Harriot Benton Ward, deceased, is entitled to recover from Charles W. Ward, as executor of the estate of

George C. Benton, deceased, the value of the 350 shares of Delta Company stock which George C. Benton, in his lifetime, converted, together with interest from the date of conversion. Evidence was offered to the effect that on February 21, 1898, the date of the conversion, the Delta Company stock had a reasonable value of $200 a share. There was no evidence, nor claim nor argument to the contrary. Accordingly, the value of 350 shares of the Delta Company stock would be $70,000; and the interest thereon, at 5 per cent per annum, from February 21, 1898, to date is $95,472, making a total of $165,472.

The judgment, therefore, will be affirmed as to the claim for 25 shares of stock of the Chicago Title & Trust Company, and reversed as to the 350 shares of stock of the Delta Company; and judgment will be entered here in favor of the Chicago Title and Trust Company, as administrator of the estate of Harriot Benton Ward, deceased, and against Charles W. Ward, as executor of the estate of George C. Benton, deceased, in the sum of $165,472.

*Judgment reversed in part and judgment here.*

O'CONNOR, P. J., concurs.

MR. JUSTICE THOMSON dissenting: In my opinion the judgment appealed from should be affirmed both as to the Chicago Title and Trust Company stock and as to the Delta and Pine Land Company stock.

The burden of proof on the issue of whether there had been a completed gift of these stocks by Benton to his daughter was on the plaintiff. It may be that a less quantum of proof will satisfy that burden and make out a prima facie case where the alleged donor is a parent and the alleged donee a child, than would be required where such a relation does not exist, but even in the latter situation, the burden of proof still rests with the one asserting the gift. In my opinion, where shares of corporate stock are purchased by a parent and issued in the name of his daughter, as in the case at bar, the mere fact of that relationship be-

tween the parties, does not make out a prima facie case in favor of a completed gift, nor give rise to a presumption that a gift took place or was necessarily intended. There is a distinction between the purchase of corporate stock in the name of another and the purchase of real estate in that manner. It does not follow from the fact that, where a father buys real estate and has the deed conveying title made out to a child, a gift of that real estate to the child will be presumed (*Hartley v. Hartley,* 279 Ill. 593), that the same rule applies in the case of the purchase of personal property such as shares of corporate stock. It is true, as counsel for plaintiff points out, that the rule which raises a presumption in favor of a gift, where such a purchase and conveyance of real estate are shown, is a rule of intention and not of conveyance. But it is also true that the question of what the rules of conveyance are may have a material bearing on the question of a purchaser's intention. In this connection, the United States Circuit Court of Appeals has said that: "Stock in a corporation is a chose in action, and the certificates are the evidence of its existence and of its amount. They bear some analogy to the title deeds of real estate (*Com. v. Compton,* 137 Pa. St. 138, 20 Atl. 417); but they are far more commanding and useful in the handling of the stock they represent than are title deeds in the handling of the land they describe." *Allen-West Commission Co. v. Grumbles,* 129 Fed. 287. In the case of a conveyance of real property, there can be no actual delivery of the thing sold. It was attempted, at least in a symbolic way, in early times, when the parties went upon the land and the seller handed a clod of earth to the buyer. But the law has substituted for that the system of the recording of deeds. And now where one buys real property and has the conveyance made to another, and such conveyance recorded, it will be presumed that in taking those steps the buyer intended them to have the effect the law imports, and that delivery has taken place. In

the case of a stranger, a resulting trust will be presumed, and in the case of a parent and child or husband and wife, it will be presumed a gift was intended. But, in my opinion, we have a different situation in the case of such a purchase of personal property, even where it consists of a chose in action, like stock in a corporation. It is true that a share of stock in a corporation consists of an aliquot part of the property of that corporation and that the certificate one holds for that share is not the stock itself but merely represents it. But the actual share of stock is an intangible thing. It cannot be handled or ever seen or described by metes and bounds, as in the case of real property. The only way that stock may be handled is by means of the certificate, which represents it. In the case last cited the court said: "Because the stock in a corporation is transferred by means of the delivery, or by means of the indorsement and delivery of the certificates, the latter by a sort of mental substitution came to be thought of and dealt in as the stock itself. The stock of corporations is ordinarily transferred on the books of the company only by the surrender of the certificates and the issue of new ones to the grantees. Hence assignments, bills of sale, conveyances, without the accompanying possession and delivery of the certificates, are much less effectual or available to command the title, the dominion or the control of the stock than the mere possession of the certificates themselves. The indorsement and delivery, or the mere delivery, of the certificates, without entry of the transfer upon the books of the corporation, is generally held to constitute a valid sale of the stock between vendor and vendee, or a completed gift of it between donor and donee. Such an indorsement and delivery of the certificates generally enables the holder to enforce a transfer of the title to the stock upon the books of the corporation." Later on in that opinion the court says: "Again, a recorded deed of real estate, or a recorded brand of cattle, in the name of the donee, without a

CHICAGO—FIRST DISTRICT—JUNE, 1925.    521

delivery of the subjects of the gifts, may well be sustained, because the donor, by placing the record title in the donee, places the property irrevocably beyond his dominion or control.  *  *  *  But 'if an owner of shares of stock in a corporation, intending to give them to A., should take the scrip to the office of the company and surrender it, and receive new scrip in the name of A., has he by this change of title on the books of the company,  *  *  *  without any delivery thereof to A., accomplished a valid executed gift of the ownership of the shares to his intended donee? We should say clearly not.' *In re Crawford,* 113 N. Y. 560, 567, 21 N. E. 692, 5 L. R. A. 71. The reason for the difference between a gift executed by a recorded deed of real estate and one unexecuted by a failure to deliver certificates of stock is that the record title to real estate controls and draws to it the possession and dominion of the property and its title deeds, while, on the other hand, the possession of certificates of shares of stock commands the dominion and control and the record title of the stock.  *  *  *  If the subject of the gift is a chose in action, such as a bond, a note, or stock in a corporation, the delivery of the most effectual means of reducing the chose to possession or use, such as the delivery of the bond, the note, or the certificate of stock, if present and capable of delivery, is indispensable to the completion of the gift.''

As pointed out by the author of the article on ''Gifts of Corporate Shares,'' in 20 Illinois Law Review, 8, referred to in the majority opinion, the English courts hold that a transfer of such shares, on the books of the corporation, coupled with proof of a donative intent, will constitute a valid gift, without delivery of the shares to the donee. But there are two lines of decisions in the American courts, one following the English cases and the other holding the contrary. An example of the former line of American decisions is to be found in *Roberts' Appeal,* 85 Pa. St. 84. The

majority of the American courts hold as the court did in *Allen-West Commission Co. v. Grumbles, supra,* that either an actual or constructive delivery of certificates of stock is indispensable to the completion of a gift of such stock. Among the cases so holding are *Besson v. Stevens,* 94 N. J. Eq. 549; *In re Bauernschmidt's Estate,* 97 Md. 35; *Getchell v. Biddeford Sav. Bank,* 94 Me. 452; *In re Crawford,* 113 N. Y. 560; *Crouse v. Judson,* 84 N. Y. Supp. 755; *Jackson v. Twenty-third St. Ry. Co.,* 88 N. Y. 520; *Walker v. Walker,* 66 N. H. 390; *Cummings v. Bramhall,* 120 Mass. 552; *Grady v. Wheaton,* (R. I.) 100 Atl. 881; *Casteel v. Flint,* 112 Iowa 92, 83 N. W. 796; *Breitenbach v. Schoen,* 183 Wis. 589, 198 N. W. 622; *Jones v. Jones,* (Mo. App.) 201 S. W. 557; *Hatcher v. Buford,* 60 Ark. 169.

In *Besson v. Stevens, supra,* the court said:

"Stockholding has a dual aspect. On the one hand, it involves a contractual relationship between corporate entity and the stockholder, and on the other, it involves the ownership of property,—of an interest in the corporate property. * * * Considering the matter from the property aspect—the transfer of the stockholder's ownership of property or interest in corporate assets—the transaction is one solely between transferor and transferee. The corporation has no interest in the thing from this standpoint,—it is an outside party entirely. Either before or since the act of 1916 (Uniform Stock Transfer Act) hereinbefore referred to, the change of ownership is complete upon the delivery by the transferor to the transferee of the certificates duly assigned. *Matthews v. Hoagland,* 48 N. J. Eq. 455, 486. Thereafter the corporation is a mere agent, so to speak, of the transferee, to perfect his legal title, supply him with the evidence thereof and perfect his relationship to and with the other stockholders. Conversely, it seems to me, where the transferor delivers nothing to the transferee, but delivers the certificate and assignment to the company, the latter is simply the agent of the transferor to accomplish the delivery to the transferee. That is not done

until the delivery of the new certificate to the transferee (although it might conceivably be done by delivering the old certificate and assignment to him). Until that is done the change of ownership is not complete; until it is done there is no relationship between the corporation and the transferee; and until it is done the transferor can, at least in the case of a gift, stop the agent's action in the matter just as well as he could stop his own hand half extended toward a manual delivery of a gift of a watch or a dollar bill. It is not done when the new certificate is delivered by the corporation, not to the transferee but back to the transferor. Until the delivery of the new certificate to the transferee, the transferor has not stripped himself completely of dominion and control, nor as nearly completely as possible under the circumstances and nature of the thing given. His retention of possession of and control over the new certificate deprives the transferee of complete dominion and control. The latter could not sell or transfer the stock to anyone else, even though he might vote and receive dividends thereon. Hence, even though so intended, it is not a legally valid and sufficient act of delivery. I think, perhaps, it is somewhat clearer if looked at from another angle. Suppose testator, after receiving the new certificate from the company, had changed his mind and decided that he wanted the stock for himself; that Elsie (the alleged donee) had demanded the certificate from him and he refused to give it to her. There is no doubt in my mind that Elsie's claim of ownership, in whatever court or by whatever form of action asserted, would not be sustained.''

In the *Bauernschmidt* case, *supra,* the court said:

''There can be no perfected gift where there has been no complete surrender over the thing given.'' There was presented in that case the question of whether there has been a completed gift of certain shares of corporate stock by Bauernschmidt to his wife. The court pointed out that the alleged donor ''was not only president of the company, but in fact the owner of all its property. He issued and canceled certificates, seemingly, as he pleased. * * * His

dealing with the stock and her acquiescence in what he did, and the fact that he could, and did, as the actual owner of all the property which the company possessed, exercise complete control over those 140 shares, show that he had never surrendered dominion over them, or put it out of his power to revoke the gift of them.   *   *   *   There can be no gift which the law will recognize where there is reserved to the donor, either expressly or as a result of the circumstances and conditions attending the transaction, a power of revocation or a dominion over the subject of the gift. There must be no *locus penitentiæ,* and there is always a *locus penitentiæ* when the supposed donor may at any moment undo what he has done. *Brewer v. Bowersox,* 92 Md. 570; *Whalen v. Milholland,* 89 Md. 199. If the donor retains dominion over the thing given, precisely as he had control of it before the alleged gift was made, there is obviously no perfected gift, because there has been no change of possession, and there is still an opportunity to recant.   *   *   *   Conceding that he designed to make a gift to his wife of the securities then in the box (in which the securities were kept), still if he was free   *   *   *   to do what he pleased with those securities, notwithstanding the terms of the renting, then there was a *locus penitentiæ* reserved, and consequently there was no perfected gift, even though in point of fact he did not attempt to exercise the dominion which he retained. It is the *existence* and not the exercise of the *locus penitentiæ* which defeats a gift *inter vivos.*   *   *   *   A gift is more than a purpose to give, however clear and well settled the purpose may be. It is a purpose executed. It may be defined as the voluntary transfer of a chattel completed by the delivery of possession. It is the fact of delivery that converts the unexecuted and revocable purpose into an executed and therefore irrevocable contract.''

The case at bar is similar to the *Bauernschmidt* case in the circumstance that Benton was the president and principal stockholder of the Delta and Pine Land Company and apparently controlled it and was

Chicago Title & Trust Co. v. Ward, 237 Ill. App. 500.

in a position to do about as he pleased in matters affecting the transfer of its stock.

In *Getchel v. Biddeford Sav. Bank, supra,* one Moore, in the lifetime of his wife, purchased certain shares in the bank, paying for them with his own money but having the certificates representing the shares made out in his wife's name. He kept the certificates in his own files, drew the dividends on the stock and receipted for them in his own name. It was not shown that his wife ever had the certificates in her possession or knew that the shares were in her name. After her death, Moore surrendered the certificates to the bank and induced the officers to issue new certificates to him in his own name. The court said that the facts presented did not present a question as to whether the transactions involved, "operated to vest in Mrs. Moore, in her lifetime, the strict legal title to the property. That might be, and yet the actual beneficial ownership remained all the time in Mr. Moore. In such a case she would simply have held that legal title in trust for him and the court could compel her administrator to transfer it to the administrator of Mr. Moore's estate. *Gray v. Jordan,* 87 Me. 140. The only question is whether the actual beneficial ownership was transferred to Mrs. Moore, for, if it was not, her administrator cannot maintain a suit against either bank for yielding up the property to the actual beneficial owner. That such ownership was not transferred to Mrs. Moore must be apparent. There was no gift completed by delivery nor was there any complete declaration of trust in her favor,—one or the other of which is essential to vest the property in her. (Citing cases.) The plaintiff urges that, as between husband and wife, it should be presumed that a gift was intended. Their relationship is a circumstance but not a controlling one. Even if a gift was intended, it was not perfected. *Kennebec Sav. Bank v. Fogg,* 83 Me. 374.''

The decision of the case at bar, announced in the foregoing majority opinion, is apparently based upon a conviction that although the majority of the American jurisdictions have held to the contrary, the decisions on the question, in this State, follow the English rule. In my opinion, such references as have been made to this subject by our courts do not reasonably bear that interpretation. In the case of *Colton v. Williams*, 65 Ill. App. 466, the peculiar circumstances involved were such as to constitute a constructive delivery of the shares of stock by Gordon to his second wife. As the court there pointed out: "The natural place of deposit of the certificate was in the iron safe in the store (of which the husband was the proprietor), whether the stock was owned by him or her (his wife). That fact, together with the fact that Gordon went to the bank (certain of its shares of stock being the stock in question) with his second wife, and in her presence told the president of the bank that he had given the stock to her and that it was her property and that the bank was to allow her to receipt for dividends; that the husband suggested that there would be no need for the issuance of a new certificate, because the name of his second wife was the same as that of his first, from whom he had inherited the stock; and the further fact that this plan was assented to, and the second wife was recognized by the bank as the owner, and receipted for all dividends on the stock until the death of her husband, with one exception, would seem to make out a constructive delivery of the stock to the second wife. It therefore seems to me that the remark of the court to the effect that "delivery of the certificate was not essential to the transfer" should be treated as dictum.

In *Allen v. Williams*, 212 Ill. App. 114, the dictum pronounced in the *Colton* case is referred to with apparent approval. In that case a judgment had been secured against one Charles A. Allen, and an attempt was made to satisfy the judgment by a levy on certain

corporate stock, as the property of the judgment debtor. The son of the latter filed a bill to enjoin the sale of the stock, claiming that it had been transferred to him by his father, by a written assignment. The proof showed that no certificate had ever been issued for this stock; that the son had made many advances of money, aggregating a large amount, to his father, and that in payment for those advances the father had made a written assignment of the stock to his son. There was no evidence to show that the son had ever permitted his father to use the stock in a way that might mislead creditors. The court held that under those circumstances the stock must be considered as the property of the son and not subject to levy under the execution issued on the judgment against the father. There also it may be said that there was at least a constructive delivery of the stock by the father to the son.

The case of *Allmon v. Salem Building & Loan Ass'n,* 194 Ill. App. 224, also referred to in the majority opinion, cites the *Colton* case, but not in connection with the point involved in the case at bar. The *Colton* case is likewise cited on a point not involved here in *Shirley Farmers' Grain & Coal Co. v. Douglass,* 130 Ill. App. 285.

Counsel for plaintiff contend that the decision in the *Colton* case was cited and upheld by the Supreme Court in *People v. Lihme,* 269 Ill. 351. An examination of the opinion in that case discloses that the *Colton* case is nowhere referred to by the court, and, in my opinion, it may not be said that the decision in the *Lihme* case upholds the principle which it is contended the court laid down in the *Colton* case. The question involved in the *Lihme* case was whether or not Lihme was a duly qualified director of a certain corporation. An attempt had been made to qualify him as such, by a transfer of a share of stock on the books of the company and the issuance of a certificate in his name representing that share. This certificate was indorsed

in blank by Lihme and deposited in the safety deposit box rented by the heirs of one Hegler, who claimed to be the beneficial owners of the stock. The contention was advanced that Lihme was not a stockholder, within the meaning of the statute requiring directors to be stockholders. There it will be seen that Lihme had made a delivery of the certificate of stock, but no transfer of the stock had been made on the books of the company. No question was raised as to the ownership of this stock, as between him and the parties to whom he had delivered the certificate, but the question was as to whether, under all the circumstances, as between him and the corporation, he could be considered a stockholder. The court held that title could pass from him only by surrender of this certificate and a transfer on the books of the company. The court said: "He could confer an equitable title upon an assignee by a delivery of the certificate, with the blank assignment and power of attorney thereon, signed by the appellee, but the legal title would still remain in the appellee until a transfer was made on the books of the company." In my opinion, that has nothing to do with the proposition involved in the case at bar. It may be that a stockholder remains a stockholder, so as to qualify for election as a director, as long as the books of the corporation show him to be a stockholder, but that is by no means saying that he may accomplish a valid and completed gift of his stock to another, by having his stock transferred to that other on the books of the company and a certificate issued in the name of that other, but retained in his possession and never delivered.

In my opinion, it may not be said that the law of this State has been laid down contrary to the majority rule in this country, which is to the effect that the proponent of a gift of corporate shares may not meet the burden of proof which is upon him by showing merely that the stock has been bought and paid for

by the alleged donor, and the certificates have been issued in the name of the alleged donee, but, so far as the evidence shows, had never left the possession of the donor. For that reason, I am of the opinion that the plaintiff in the case at bar failed to prove that Benton had ever executed a completed gift of either of the stocks involved in this case to his daughter.

As to the Chicago Title and Trust Company stock, there is an additional reason why it could not be held that Benton was guilty of conversion. Even if it be conceded that there was a completed gift from him to his daughter, as to that stock, and even if it be conceded further that he was the one who, nearly two years after his daughter's death, delivered the certificate representing that stock to the company, for transfer to Shedd, the further fact that when it was so delivered it bore the genuine indorsement of his daughter would conclusively preclude any possibility of a conversion on his part.

For the foregoing reasons, I am of the opinion that the judgment appealed from should be affirmed.